UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANTIGONI STAVRAKIS,

     Plaintiff,

v.                                                                          Case No: 8:16-cv-2343-T-17JSS

UNDERWRITERS AT LLOYD'S
LONDON,

     Defendant.
_____

## ORDER

This action for declaratory judgment regarding the duties of the Defendant, Underwriters at Lloyd's London (the "**Defendant**"), to defend and/or indemnify the Plaintiff, Antigoni Stavrakis (the "**Plaintiff**"), was tried before the Court on November 6, 2017. According to the Court's order on summary judgment (Doc. No. 52), the sole factual issue for trial was whether the Plaintiff's son, Phillip Stavrakis, was a member of her household at the time of the shooting incident that prompted this dispute. If Phillip Stavrakis was a member of his mother's household, any losses caused by Phillip's conduct are not covered under the Defendant's policy of insurance. If, on the other hand, Phillip Stavrakis was not a member of the Plaintiff's household, any injuries he caused would not be excluded from coverage under the policy. Having considered the parties' positions and the evidence introduced and admitted at trial, the Court makes the following findings of facts and conclusions of law[1] in accordance with Federal Rule of Civil Procedure 52(a)(1):

_____

[1] To the extent any findings of fact may constitute conclusions of law, or vice versa, they are adopted as such.

## I.  Findings of Fact

### A.  The Parties

1.      The Plaintiff, Antigoni Stavrakis, owns a duplex comprising Units 406 and 410, Grand Boulevard, Tarpon Springs, Florida 34689. (Trial Tr. 8:18-23; 13:18-22).

2.      The Defendant is the Plaintiff's homeowner's insurer pursuant to a policy covering 410 Grand Boulevard effective August 6, 2012 through August 6, 2013. (Doc. No. 45-3, at 8).  The policy provides for $300,000 in personal liability insurance for bodily injury or property damage caused by an occurrence under the policy. (Doc. No. 45-3, at 48).

### B.  The Duplex

3.      The Plaintiff's property located at 406 and 410, Grand Boulevard, Tarpon Springs, Florida 34689 was originally constructed as a triplex. (Trial Tr. 11:10-14). The Plaintiff and her late husband lived together in Unit 410 for more than 50 years. (Trial Tr. 9:1-2).  During that time, the Plaintiff's aunt lived in the middle unit, Unit 408, for approximately 15 years. (Trial Tr. 11:17-22).  When the Plaintiff's aunt passed away, the property was converted into a duplex, and Unit 408 was combined into Unit 410. (Trial Tr. 11:12-21; 13:18-22).

4.      Throughout this time, Unit 406 was reserved as a rental unit. (Trial Tr. 11:22-25).  Unit 406 is a fully-functioning, self-contained, one bedroom, one bathroom apartment. (Trial Tr. 62:19-22).  There is no shared living space or internal means of access between Units 406 and 410. (Trial Tr. 13:15-17).  Units 406 and 410 share a common laundry facility located on (and only accessible from) the exterior of Unit 410. (Trial Tr. 15:1-6; 59:2-5).

**C.     Occupation of Unit 406 by John D. and Phillip Stavrakis**

5.     In the past, the Plaintiff's late husband rented Unit 406 to various tenants living in the Tarpon Springs area. (Trial Tr. 63:14-18).   However, more recently, the Plaintiff and her late husband allowed their adult sons --- John D. (age 58) and Phillip (age 59) --- to live in Unit 406. (Trial Tr. 12:4-12; 9:20—10:9).  The Plaintiff and her late husband did not require either of their sons to enter into written lease agreements or pay rent when they lived in Unit 406. (Trial Tr. 14:3-8).  Rather, John D. and Phillip paid their parents approximately $300 per month to cover their utilities. (Trial Tr. 14:13-18; 57:5-10).  The Plaintiff and her late husband paid all of the taxes and insurance on Units 406 and 410. (Trial Tr. 27:13-22).

6.     John D. lived in Unit 406 for approximately 5 years. (Trial Tr. 12:5-7).  While residing in Unit 406, John D. assisted his parents by mowing the lawn and helping them maintain their financial affairs. (Trial Tr. 108:14-24; 117:18—118:3).  After John D. moved out, the property sat vacant for a period of time, and was later occupied by Phillip. (Trial Tr. 12:9-12).

**D.     Phillip Stavrakis' Personal Life while Living in Unit 406**

7.     Before moving into Unit 406, Phillip had been estranged from the family for approximately 20 years. (Trial Tr. 114:18-24).   At some point, Phillip attended and obtained a master's degree in clinical psychology from a college in Alabama. (Trial Tr. 12:9-11).  He then moved back to Florida and spent some time living in another apartment in the Tampa Bay area with his girlfriend and their child. (Trial Tr. 12:9-14).

8.     After Phillip began living in Unit 406, his father became blind and was unable to drive. (Trial Tr. 16:23—17:2).  As a result, Phillip began driving his father to various appointments and, due to the two spending more time together, Phillip and his

3

father became very close. (Trial Tr. 17:1-2). While Phillip purportedly maintained his own automobile insurance, (Trial Tr. 29:6-8), due to the fact that he was driving his father's vehicle to and from medical appointments, Phillip was added to his parents' auto insurance policy as an additional driver. (Trial Tr. 75:5-11; 77:20-24).

9.      When Phillip first began living in Unit 406 he had a job working at a drug rehabilitation clinic. (Trial Tr. 16:13-20). However, Phillip was subsequently diagnosed with multiple sclerosis and was unable to continue working. (Trial Tr. 16:21-22). Nevertheless, during this time, Phillip was able to maintain a relationship with a female friend, Katherine Manousos, who he dated for approximately five months between March and August of 2012. (Trial Tr. 81:14-19). While the two dated, Ms. Manousos would visit Phillip three to four times a week at Unit 406. (Trial Tr. 81:24—82:1). Ms. Manousos and Phillip would visit the Plaintiff and eat meals with her in Unit 410 once or twice a week. (Trial Tr. 82:19—83:4).

### E.      The Shooting Incident

10.     This story took a tragic turn on August 12, 2012, when the Plaintiff's husband passed away. (Trial Tr. 108:17-20). The following day, August 13, 2012, the Stavrakis family congregated in Unit 410 to prepare funeral arrangements. (Trial Tr. 108:19-20). During the afternoon of August 13, 2012, John D. noticed that Phillip was not present at the family gathering and decided to go next door to Unit 406 to console him. (Trial Tr. 108:21-23). John D. walked to Unit 406 and knocked on the door, at which time Phillip opened the door and allowed John D. to enter the apartment. (Trial Tr. 108:23—109:2). When John D. stepped in he observed that Phillip was holding a pistol in his right hand. (Trial Tr. 109:3-4). John D. attempted to give Phillip a hug, but Phillip shot him in the abdomen. (Trial Tr. 109:6-8). Phillip then shot John D. a second time through the

right arm, a third time in the left arm, and a fourth time in the back. (Trial Tr. 109:16-21). During the melee, John D. made a break for the back door of the apartment and managed to escape. (Trial Tr. 109:22—110:8). John D. then managed to run back to Unit 410, at which time medical personnel were called and John D. was airlifted to Bayfront Medical Center where he remained for 36 days. (Trial Tr. 108:7-13; 110:6-14).

11. Phillip was subsequently apprehended, charged with first-degree attempted murder, and convicted of second-degree attempted murder. (Trial Tr. 110:15—111:2). Phillip is currently incarcerated in the Florida prison system. (Trial Tr. 111:3-5).

## F.    The State Court Action

12. Following the shooting, John D. and his wife filed a lawsuit against the Plaintiff in state court alleging that she was negligent in allowing Phillip to live in Unit 406 and for failing to warn John D. that he possessed a firearm. (Trial Tr. 20:1-15). The Plaintiff notified the Defendant of the lawsuit, and requested that it defend and indemnify her for any losses. (Trial Tr. 21:7-15). The Defendant denied the Plaintiff's requests and this lawsuit ensued. (Trial Tr. 73:5-16).

## II.    Conclusions of Law

13. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), as the Plaintiff is a citizen of a State, the Defendant is a citizen of a foreign state, and the amount in controversy exceeds $75,000.00.

14. "Pursuant to Florida law, interpretation of an insurance policy is a question of law to be decided by the court." *Divine Motel Grp., LLC v. Rockhill Ins. Co.*, 2015 WL 4095449, at *6 (M.D. Fla. July 7, 2015) (internal quotations omitted). In determining whether a policy provides for coverage, "the insured bears the [initial] burden of proving that a claim is covered." *Id.* Where the insured satisfies this initial burden, but the insurer

5

argues that an exclusion otherwise bars coverage, "the burden of proving an exclusion to coverage is on the insurer." *Id.*

15. Section II. A. of the Defendant's insurance policy, titled "Coverage E – Personal Liability," provides coverage for bodily injury or property damage caused by an "occurrence." (Doc. No. 45-3, at 48). The policy defines "[o]ccurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: a. 'Bodily injury'; or b. 'Property damage.'" (Doc. No. 45-3, at 34).

16. Section II. E. of the policy goes on to exclude from coverage any bodily injury or property damage "expected or intended by an insured." (Doc. No. 45-3, at 49).

17. The issue for trial is whether Phillip Stavrakis is an "insured" under the policy. If he is, the exclusion for injuries "expected or intended by an insured" applies and, consequently, any bodily injuries or property damage caused by Phillip Stavrakis are not covered under the policy.

18. The policy defines the term "[i]nsured," in pertinent part, as the named insureds and residents of the named insureds' "household" who are relatives. (Doc. No. 45-3, at 33). The policy lists the Plaintiff and her late husband as the named insureds. (Doc. No. 45-3, at 8). Since Phillip is not a named insured, he only qualifies as an insured if he is a member of his mother's household.

19. The term "household" is not defined in the policy, but courts have interpreted the term to include persons who share "(1) close ties of kinship, (2) a fixed dwelling unit, and (3) enjoyment of all the living facilities." *Row v. United Services Auto. Ass'n*, 474 So.2d 348, 349 (Fla. 1st DCA 1985). More broadly, "the main thread of a family

6

household is the sharing of companionship and living facilities in a dwelling unit by members of a household." *Id.*

20.　In *Am. Security Ins. Co. v. Van Hoose*, the Fifth District Court of Appeal considered whether a daughter living in a house across the street from her father was a member of her father's household. 416 So.2d 1273, 1274 (Fla. 5th DCA 1982). The court noted that despite the fact that the daughter had a job, she still received substantial financial assistance from her father. *Id.* at 1275. Nevertheless, the daughter maintained her lease, utilities, and tax obligations in her own name. *Id.* at 1276. Additionally, prior to moving in across the street from her father, the daughter had been married and lived in Michigan for several years. *Id.* Based on those facts, the court held that the daughter was not a member of her father's household simply by virtue of the fact that they lived across the street and he paid a substantial portion of his daughter's expenses. *Id.* Rather, the court held that the daughter's acts of marrying, moving to Michigan, and attempting to establish her own household upon returning to Florida demonstrated that she and her father maintained separate households. *Id.*

21.　In *Row*, the First District Court of Appeal was charged with deciding whether a son living in one unit of a 12 unit quadriplex complex owned by his father was a member of his father's household. 474 So.2d at 350. In *Row*, the son suffered from a mental illness that required repeated hospitalizations and periods of confinement. *Id.* at 350. Afterwards, the son was discharged into his father's care, at which time he began living in the quadriplex unit. *Id.* While the son lived at the quadriplex, his two younger brothers, sister, and father also resided in separate units at the complex. *Id.* Each child had a master key to the family units and were free to come and go among the units as they

7

pleased. *Id.* None of the children paid any rent or signed lease agreements, however they did perform maintenance and upkeep around the complex. *Id.* While living at the quadriplex, the son did not maintain a regular job. *Id.* Based on the "unique circumstances" of the case, the court held that the son and his father shared characteristics essential to the concept of a family household. *Id.* at 351. The court distinguished the situation in *Row* from that in *Van Hoose*, noting that unlike in *Van Hoose*, the son did not take a prolonged leave of absence from the family unit and instead was accorded the financial and emotional support typically extended to a dependent member of a family household. *Id.*

22.     Similarly, in *Kepple v. Aetna Cas. & Sur. Co.*, the Second District Court of Appeal was faced with an analogous situation in which a newlywed daughter and her husband moved into a converted carport in her parents' home. 634 So.2d 220, 221 (Fla. 2d DCA 1994). The young couple had their own small kitchen, bedroom, and bathroom. *Id.* While this living arrangement provided the young couple with some semblance of privacy, all of the involved persons had free access to the entire residence. *Id.* Moreover, the young couple did not pay any rent or utilities, and the daughter was not employed. *Id.* Prior to moving into the attached carport with her new husband, the daughter lived at home wither her parents. *Id.* Under those circumstances, the court held that the daughter was a member of her parents' household. *Id.* at 223.

23.     In contrast to the persons involved in the *Row*, *Van Hoose*, and *Kepple* cases, Phillip Stavrakis is not a young adult who has yet to obtain complete independence from his parents. To the contrary, Phillip Stavrakis is 59 years old, (Trial Tr. 9:20—10:9), has an adult child of his own, (Trial Tr. 74:7-15), has a history of maintaining serious

relationships with female companions, (Trial Tr. 81:14-19), and paid many of his own expenses. (Trial Tr. 29:6-8). It further appears that Phillip has achieved an advanced degree from a post-secondary institution, (Trial Tr. 12:9-11), lived independent of his parents for several decades, (Trial Tr. 114:18-24), and worked for substantial periods of his adult life. (Trial Tr. 16:13-20). Moreover, it appears that until recently, Phillip was not close with his parents or other siblings, and instead was estranged from his family for approximately 20 years. (Trial Tr. 114:18-24). These facts all militate away from a finding that Phillip was a member of his parents' household at the time of the shooting incident.

24.    On the other hand, the facts that Phillip was free to come and go between Units 406 and 410,[2] did not pay rent, (Trial Tr. 14:3-8), and shared meals with his parents, (Trial Tr. 82:19—83:4), are somewhat indicative of a family household relationship. Moreover, it appears that as Phillip's father's health declined, Phillip became more involved in his father's affairs, such as by driving him to medical appointments. (Trial Tr. 17:1-2). As Phillip's interactions with his father increased, Phillip and his father grew closer, ostensibly beginning the process of repairing whatever issues had previously caused his estrangement. (Trial Tr. 16:23—17:2). However, it does not appear that Phillip provided the same degree of assistance to his parents as John D., who helped his family with household chores and financial planning. (Trial Tr. 108:14-24; 117:18—118:3).

25.    As for the dwelling itself, Phillip and his parents' living situation blended aspects of a family household with those of a residential landlord-tenant relationship. On the one hand, Units 406 and 410 were essentially self-contained apartments with their

---

[2] While there is some dispute regarding whether Phillip or John D. actually had a key to their mother's unit, there is no doubt that both sons were free to visit Unit 410 whenever they liked. (22:9-11; 107:11-14).

own kitchens, bathrooms, and living facilities. (Trial Tr. 62:19-22). Moreover, the laundry facilities were located in a stand-alone laundry room that was equally accessible to both units. (Trial Tr. 15:1-6; 59:2-5). These facts are typical of a commercial landlord-tenant relationship, not of a family household. On the other hand, Phillip did not sign a lease agreement or pay rent to his parents. (Trial Tr. 14:3-8). Instead, he simply offset his expenses by reimbursing his parents for the utility bills attributable to Unit 406. (Trial Tr. 14:13-18; 57:5-10). The Plaintiff's failure to collect rent in excess of what was necessary to offset his living expenses, coupled with the Plaintiff's permitting Phillip to come and go between the units as he pleased, indicate something other than a standard commercial relationship.

26. As is evident from the foregoing, whether Phillip was a member of his parents' household is a close call. Ultimately, the main distinction between this case and *Row* and *Kepple* is that unlike in those cases, Phillip Stavrakis spent decades living as an independent adult prior to moving into Unit 406. (Trial Tr. 114:18-24). This more closely mirrors the situation in *Van Hoose*, where the daughter had been married and lived in Michigan for several years before moving in across the street from her father. *Van Hoose*, 416 So.2d at 1276. Given the lack of a preexisting family household relationship between Phillip Stavrakis and his parents, Phillip can only be deemed a member of his parents' household if he took sufficient actions subsequent to arriving at Unit 406 to re-establish a family household relationship with his parents.

27. Viewed from this perspective, the Defendant's argument that Phillip Stavrakis was a member of his parents' household falls short. The extent of Phillip's relationship with his parents appears to have consisted of subsidized housing, (Trial Tr.

14:3-8), regular (but not overly frequent) sharing of meals and socializing, (Trial Tr. 82:19—83:4), and minimal assistance and companionship, such as Phillip's volunteering to drive his father to medical appointments. (Trial Tr. 16:23—17:2). The same could likely be said, however, for many American families that reside separately in the same town or municipality. The fact that an adult child may visit his parents one or two days a week to share meals and socialize does not transform that family into a household. Nor does the fact that a parent may provide an adult child with subsidized housing, or that an adult child may run errands or perform chores for her parent, transform relatives living separately into a family household.

28.     Clearly, a household and a family are not one in the same. Stated differently, the policy requires more than a mere familial relationship with a named insured for a person to constitute an insured under the policy. Rather, to qualify as an insured, a person must be both a relative of a named insured and a member of that person's household. See (Doc. No. 45-3, at 33) (defining "insured" as the named insureds and "residents of [their] household who are . . . relatives."). As noted in Row, "the main thread of a family household is the sharing of companionship and living facilities in a dwelling unit by members of a household." Row, 474 So.2d at 349. Based on the Court's review of the evidence presented at trial, there was no sharing of companionship and living facilities in a dwelling unit in excess of what is typical of a normal American family of independent adults who live separately. Expanding the definition of the term household to include independent adult family members who reside in close proximity and share typical (but by no means extraordinary) familial bonds would set unwise precedent for insurers and insureds alike. As a result, the Court is satisfied that under the unique facts

11

of this case, Phillip Stavrakis was not a member of his parents' household at the time of the shooting incident.

## III. Conclusion

Accordingly, it is

**ORDERED** that the Plaintiff is directed to submit a proposed form of final judgment consistent with the terms of this order within 14 days.

It is further **ORDERED** that the Clerk of Court is directed to **CLOSE** this case and **TERMINATE** any pending motions.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this 1st day of December, 2017.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record